# IN THE COURT OF APPEALS OF IOWA

No. 15-1411
Filed October 14, 2015

**IN THE INTEREST OF P.R.,**
**Minor Child,**

**K.M., Mother,**
**Appellant.**

_____

Appeal from the Iowa District Court for Scott County, Mark R. Fowler, District Associate Judge.

A mother appeals from a permanency order. **AFFIRMED.**

Steven W. Stickle of Stickle Law Firm, P.L.C., Davenport, for appellant mother.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, Michael Walton, County Attorney, and Julie Walton, Assistant County Attorney, for appellee State.

Carrie Coyle of Carrie E. Coyle, P.C., Davenport, guardian ad litem for minor child.

Jean Capdevila, Davenport, attorney for minor child.

Considered by Vaitheswaran, P.J., and Potterfield and McDonald, JJ.

**POTTERFIELD, Judge.**

A mother appeals a permanency order. On our de novo review, we affirm the order changing the permanency goal to Another Permanent Planned Living Arrangement.

**I. Background Facts.**

P.R., born in 1999, came to the attention of the department of human services (DHS) after he was arrested for theft in July 2014. DHS was not able to locate the child's parents. An emergency removal order was entered and P.R. was placed in foster care.

The mother was eventually contacted via email.[1] She was in Georgia. Notes from an August 12, 2014 family team meeting indicate the mother participated via telephone. P.R. was present and expressed his desire to remain in the foster home in Iowa and go to school. The mother indicated she had limited funds. The goal of services was listed as reunification of mother and son, and if reunification could not occur, an alternate route could be Another Permanent Planned Living Arrangement (APPLA), guardianship, or termination/adoption. The case plan called for mother to find stable housing.

A child in need of assistance (CINA) hearing was held on September 30, 2014. The mother participated by telephone. After the hearing, the court concluded P.R. was a CINA, finding:

> [T]he mother left the child, 15 years of age, with a substitute caretaker in December of 2013. The mother has not had any contact with the caretaker and instead communicates with the caretaker through Facebook or e-mail with the [caretaker's son]. [The mother] has not provided financial or emotional support for

---

[1] The father was not located and did not participate in the juvenile court proceedings.

> [P.R.] There has been no direct contact with the mother and son, or between the mother and the caretaker. The mother did not provide any guardianship papers or any other documents so that [the caretaker] would be able to provide for [P.R.] Since that occurred, [the caretaker] has kicked [P.R.] out of her home leaving [P.R.] homeless, and he was placed in foster care.
>
> After leaving the child with the substitute caretaker, [the mother] moved to Georgia. [P.R.] was not aware as to why his mother moved to Georgia. [The mother] has not maintained contact with [P.R.], instead she has communicated sporadically with [P.R.'s friend] through Facebook or e-mail. During [the mother's] confusing testimony it came out that she had lived in Iowa with . . . Crawford. Crawford had a DHS finding of sexual abuse against one of [the mother's] children. [The mother] testified that she kicked him out of the residence after that finding. She now lives with Crawford in Georgia.
>
> It was clear from the testimony provided by [the mother] that [P.R.] was abandoned, neglected, that [the mother] has not provided the food, clothing, and shelter. [The mother] has provided no degree of care of supervising of [P.R.]. It was also clear from [the mother's] testimony that she may not have the mental capacity to provide proper care for [P.R.].

A November 2014 DHS report noted the mother was then living in South Carolina with a family member but was hospitalized for pneumonia. P.R. had been expelled from school and was struggling with substance abuse and mental health issues.

On December 2, 2014, a dispositional hearing was held. The mother participated by telephone. In the dispositional order, the court noted P.R. had attempted suicide in October and was diagnosed with situational depression. DHS was recommending the child cooperate with substance abuse, mental health, educational, and juvenile court services. The court approved the case plan, ordered the mother to follow through with the case plan—which included a psychological evaluation, and ordered the child remain in foster care.

In January 2015, a foster care review board hearing was held. The report includes the following notations:

> Steve Stickle (mother's attorney) reported today that . . . (mother) called and left him a message on January 5, 2015. He called her back and left a couple of messages. He has not heard back from her. Steve said [the mother] is trying to find stable housing. She wants [P.R.] back. [The mother] was having some health issues is late October to early December 2014. He said [the mother] had pneumonia. Steve said he does not know the status of [her] psychological evaluation. He said shortly after the Court ordered it she was hospitalized.
>
> Amy Huntington (DHS) reported today that she talked to [the mother] on January 5, 2015. As of then, [the mother] was still looking for low income housing in both South Carolina and Georgia. The problem she is having is that she does not have photo identification. This is delaying her getting housing and a PO Box. [The mother] reported to Amy that she has contact via phone and Facebook with [P.R.] The foster parents report phone calls are not very lengthy and can be upsetting to [P.R.] He does not verbalize this they can just tell by his mood. . . .
>
> Amy said at the last Family Team Meeting, [the mother] participated via phone. [The mother] said she does not feel she is kept in the loop regarding [P.R.]; or timely [sic]. Amy said she suggested [the mother] call the foster parents to get updates. Amy then said unless she calls or emails [the mother], she does not hear from her. Amy believes the reason she heard from [the mother] on January 5, 2015, was because Amy sent her an email about [P.R.'s] stability staffing, then [the mother] called.
>
> Amy said [P.R.] does not want to move to Georgia or South Carolina. He wants to stay where he is. He wants to stay in the home he is in. He told his foster parents he feels like a family. He is bonding with the foster family and extended family and they are to him.

The board did not support reunification as a goal noting the mother's lack of stable housing and P.R.'s expressed desire to stay with the current foster family until he reached eighteen. The board did support P.R.'s current placement.

A family team meeting was held on February 17, 2015, at which the foster parents reported P.R. was having mental health and behavioral issues, including researching ways to self-harm. The foster parents had given DHS a ten-day

notice to have P.R. removed from the home but were willing to have him return if he received appropriate help.

On February 25, 2015, the dispositional order was modified and P.R. was placed in a youth shelter pending an available opening in a Psychiatric Medical Institution for Children (PMIC) facility. P.R. attempted suicide while in the shelter; he was placed in a PMIC on March 6.

A March 4, 2015 foster care review report noted the mother was informed "a large hurdle for [the mother] is that an [Interstate Compact for the Placement of Children] ICPC study cannot be done because of [the mother] not having stable housing." The board again noted it did not support the goal of family reunification. "The [board] recommends the Permanency Goal be changed to APPLA."

A March 9, 2015 DHS report to the court indicated the mother was "still residing in South Carolina with a friend until she can secure her own housing." The mother became aware on March 4 (at the foster care review hearing) that she was to have a psychological evaluation, and DHS had not yet "had an opportunity to locate a facility in her area to conduct the evaluation." It was also reported that DHS had not been able to request an ICPC home study "due to [the mother's] current housing situation."

A review hearing was held on March 17, 2015. The mother participated by telephone. The juvenile court entered a review order on April 9, finding "reasonable efforts have been made to prevent placement of the child out of the parental home." The court ordered the child remain in the custody of DHS with placement in a recovery center.

A June 30, 2015 DHS report to the court indicated the mother "is still residing in South Carolina with a friend" and had reported "she is actively looking for housing and has been approved for a housing program" and had started a part-time job. An ICPC study had not been requested.

A permanency hearing was held on July 23, 2015. Social worker Amy Huntington testified that DHS was recommending APPLA because P.R. could not be returned home; his mother "resides in the state of South Carolina and, to my knowledge is homeless, and so the Department has not been able to request an interstate compact for placement." Moreover, P.R. "wants to stay in Iowa, and wants to reside with the current foster parents." She testified P.R. was very bonded with the foster parents, who had played an active role in his treatment and would ensure he continued to receive recommended services. Huntington testified APPLA would allow P.R.'s continued participation in behavioral health services, mental health services, and substance abuse treatment.

The mother testified that she was currently living in South Carolina in a shelter looking for a residence. She stated she had received a call from an Iowa apartment complex stating they had placed her name on a waiting list but "I cannot come up there and look at an apartment, and I wouldn't have any place to stay if I was there, so it's just kind of hard." She testified that if given more time to get housing she would be willing to ensure P.R. would get the services he needs while in her care. "I most definitely would. Even if I have to go back to Davenport because [P.R.] doesn't want to move here . . . ." The mother stated she tries to contact P.R. weekly or at least every other week. She asked for

additional time to gain housing and she asked that she and P.R. receive family therapy.

P.R.'s attorney informed the court per P.R.'s request that P.R. wanted to stay in Iowa with his foster family and that he was not interested in participating in family therapy with his mother.

The court entered its permanency order on August 6, 2015, changing the permanency goal to APPLA as recommended by DHS and the guardian ad litem.

On appeal, the mother argues reasonable efforts have not been made to reunify mother and child, and that the court should have granted her an additional six months to obtain stable housing.

**II. Scope of Review.**

We review permanency rulings de novo. *In re A.A.G.*, 708 N.W.2d 85, 90 (Iowa Ct. App. 2005).

**III. Discussion.**

The juvenile court noted the mother's complaints about services:

> [The mother] complained during the hearing that the Department of Human Services has not provided her any services. The Department of Human Services has not been able to request an interstate compact for the placement of children home study for [the mother] due to her current housing situation. In addition, [the mother] has provided no relatives for the Department to explore as possible placement options. [The mother] has not seen [P.R.] since she left Iowa. When [the mother] left, she had not even spoken to [the person with whom she left P.R.] about caring for [P.R.] She had just discussed [the person] caring for [P.R.] through [the person's] son. The Court also notes that at one point [the mother] turned down an opportunity to have an apartment . . . in Davenport. The following services have been provided to the family: family team meetings, family foster care, substance abuse evaluation and treatment, shelter placement, placement in a PMIC, and stability staffing. These constitute reasonable efforts by the Department to prevent removal of the child from the parental home.

We are not convinced the mother's complaints about services were timely; they were not expressed to the court until the permanency hearing. *See id.* at 91 ("The Department has an obligation to make reasonable efforts toward reunification, but a parent has an equal obligation to demand other, different, or additional services prior to a permanency or termination hearing."); *see also In re C.B.*, 611 N.W.489, 495 (Iowa 2000) ("This case emphasizes the critical need for services to be implemented by the DHS early in the intervention process and for the parents to actively and promptly respond to those services, as well as to voice any problems with services so changes or corrections in the case plan can be made."). In any event, we agree with the juvenile court that under the circumstances presented, the mother's extended absence from the child's life, and the child's needs and expressed wishes, the child's best interest lies in the permanency order entered. We therefore affirm.

**AFFIRMED.**